UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JEANETTE TUNIS,

                Plaintiff,

-against-                                            1:13-CV-1401 (LEK)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed in appealing a denial of Social Security benefits. Both parties have filed briefs. Dkt. Nos. 10 ("Plaintiff's Brief"); 13 ("Defendant's Brief"). For the following reasons, the judgment of the Social Security Administration ("SSA") is affirmed.

**II.    BACKGROUND**

    **A.  Plaintiff's Medical Records**

Plaintiff Jeanette Tunis ("Plaintiff"), who was fifty-nine years old at the time of the SSA Commissioner's ("Commissioner") decision, has a history of depression; anxiety with panic attacks; Post-traumatic Stress Disorder ("PTSD"); head, neck, and back pain; and shingles. Dkt. No. 8 ("Record") at 161, 233, 236, 263, 266, 444.

        *1. Depression and Anxiety*

Plaintiff's extensive medical record commenced for purposes of this case on December 23,

1998, when she was diagnosed with depression by Sparta Medical Associates ("Sparta"). R. at 233. Her treating doctor prescribed medication, advised her to take twenty to thirty minutes per day for quiet time, and recommended counseling for stress management. Id. She was evaluated again by the same doctor on March 10, 1999, and was prescribed medication and advised to consider therapy. R. at 234. On June 9, 1999, Plaintiff was re-evaluated by a different doctor at Sparta. R. at 235. Her depression diagnosis was confirmed and the doctor prescribed her an increased dosage of medication and advised her to follow a healthier diet. Id.

Plaintiff's depression was documented again at a physical on March 23, 2000. R. at 244. On February 22, 2001, her depression diagnosis was again noted by the same doctor when she sought help after feeling depressed from certain life changes and marital troubles. R. at 258. At this appointment, the doctor told her to continue taking her medication and to consider consulting a therapist. Id. There is no evidence in the Record to suggest that Plaintiff had been in therapy or stress management between her December 1998 doctor visit and this appointment. See R. at 233-58.

Plaintiff has also been diagnosed with anxiety with panic attacks. R. at 263. On November 14, 2001, Sparta diagnosed her with anxiety after she arrived with complaints of an inability to focus or remember things, and of sometimes getting "hyped up" and having a panic attack. Id. The treating doctor recommended counseling. Id. Plaintiff's anxiety diagnosis was confirmed on August 20, 2002, and she was prescribed medications. R. at 269. The anxiety diagnosis was again confirmed by a doctor at Sparta on November 28, 2007; the doctor prescribed medication for Plaintiff's anxiety. R. at 304.

Plaintiff's depression and anxiety has continued for many years, and her diagnoses were

again confirmed on March 4, 2010, by Dr. Suma Ghanta ("Dr. Ghanta"). R. at 521-24. On April 10, 2010, Dr. Anthony Miccio ("Dr. Miccio") diagnosed Plaintiff with general anxiety. R. at 516-19.

On March 15, 2011, Plaintiff saw a psychologist, Dr. Kerry Brand, Ph.D. ("Dr. Brand"). R. at 440-45. Plaintiff reported to Dr. Brand that she "ha[d] been experiencing symptoms of depression for years," and that she had previously taken medication for her depression. R. at 441. She also reported feeling upset and overwhelmed due to her husband's abuse and her financial situation at the time. Id. Plaintiff reported the following symptoms at the time: dysphoric mood, fatigue, crying spells, feelings of guilt, feelings of worthlessness, diminished self-esteem, concentration difficulties, and diminished sense of pleasure. R. at 441. Dr. Brand noted that these are all symptoms of depression. R. at 440-45.

Plaintiff also reported to Dr. Brand that she had been experiencing anxiety-related symptoms, including being worried over nothing and getting worked up. R. at 441. She also reported anxiety-related symptoms of fatigue, irritability, restlessness, difficulty concentrating, and muscle tension. Id. In addition, Plaintiff reported experiencing panic attacks when she experienced significant stress. Id. She told Dr. Brand that the last panic attack had occurred a couple of weeks prior to the appointment, and that during each episode, she experiences heart palpitations, tightness in her chest, shaking, dizziness, and breathing difficulties. Id. Dr. Brand diagnosed Plaintiff with depression, PTSD, and panic disorder without agoraphobia. R. at 444.

    *2. Neck and Back Pain*

Plaintiff alleges that her neck and back pain initially began thirty-six years prior to her hearing with the Administrative Law Judge ("ALJ"), when she suffered injuries from a motor

3

vehicle accident and was the victim of spousal abuse. R. at 69-70. After she contracted shingles, she says, this pain progressively worsened over time and she has participated in numerous medical trials for severe pain. R. at 61-64.

In July 1999, Plaintiff was treated at Sparta on four different occasions—July 8, July 16, July 26, and July 29—for neck and back pain. R. at 236-39. A few weeks later, on August 3, 1999, Dr. Robert F. Traflet ("Dr. Traflet") conducted an MRI of Plaintiff's cervical spine, which showed a bulging disc at C5-6, straightening of the cervical curvature, and spondylosis. R. at 316. Specifically, the MRI showed a posterior bulging of the annulus fibrosis at midline and also to the right and left of the midline at C5-6. Id. Dr. Traflet also noted that degenerative changes were present. Id. He found that there was relative decreased signal in the nucleus pulposus at all levels, reflecting degeneration of the disc material. Id. The MRI also showed mild degenerative hypertrophy at the Luschaka's joints at C5-6 and C6-7, with impression upon the foramina. Id. Plaintiff also sought and received treatment for her back pain throughout August 1999. R. at 239-41.

In March and May of 2000, Plaintiff returned to Sparta for treatment for her back pain. R. at 244-48. On August 7, 2000, Plaintiff again went to Sparta, this time complaining of neck pain and "shock feelings." R. at 250. The treating doctor prescribed pain medications for these problems. See id. Plaintiff visited Sparta four more times that month with similar complaints, and her pain medications were refilled. R. at 251-54. In April and August of 2001, Plaintiff again sought treatment from Sparta for neck and back pain. R. at 260-61. The treating doctor prescribed pain medication. Id. Plaintiff returned in January and June of 2002 with similar complaints of neck and back pain. R. at 264, 268.

Plaintiff's neck and back pain did not subside, and another MRI of Plaintiff's cervical spine, taken by Dr. Matthew T. Skalla ("Dr. Skalla") on July 6, 2002, showed "significant degenerative changes" at C5-6 with disc space narrowing, and approximately three millimeters of retrolisthesis. R. at 222. This MRI also showed mild spinal stenosis and bilateral neural foraminal narrowing at the same level (C5-6). Id. In addition, the MRI showed neural foraminal narrowing on the left side at C2-3 and C3-4 due to facet arthropathy, and mild narrowing at C6-7. Id.

On July 15, 2002, Plaintiff sought treatment for her head, neck, and back pain at the Medical Office of Doctors Hubschmann, Koziol, Gilman, and Insinga. R. at 326. On August 19, 2002, X-rays of Plaintiff's cervical spine taken by Dr. Hector O. Cordero ("Dr. Cordero"), showed cervical spine degenerative disease. R. at 224.

Plaintiff returned to Sparta several more times between 2002 and 2008. R. at 271-77, 290-91, 297-301, 307-08. On each occasion, she complained of neck and mid-to-lower back pain. Id. Each time, the doctors prescribed pain medications, or otherwise called to have her prescriptions extended. Id.

An MRI of Plaintiff's cervical spine done on August 14, 2008, by Dr. Frederick Corio ("Dr. Corio") showed extensive productive bony change at C5-6 resulting in severe bilateral neural foramina narrowing. R. at 219. Dr. Corio opined that Plaintiff's problems had progressively worsened and that the severe bilateral neural foramina narrowing was more prominent than that which appeared on Plaintiff's previous MRIs. Id.

On April 7, 2009, Plaintiff returned to Sparta complaining of back pain, and again was prescribed pain medications. R. at 311. On March 18, 2010, Plaintiff went to see Dr. Michael Gutkin ("Dr. Gutkin") with complaints of neck and mid-to-lower back pain. R. at 504. She

5

described the pain to Dr. Gutkin as burning and shooting, and said she had experienced spasms, swelling, and achiness. Id. Dr. Gutkin diagnosed her with brachial neuritis, confirmed the diagnosis of cervicalgia, and noted intervertebral disc displacement without myelopathy. R. at 505.

On June 12, 2010, Plaintiff received continued treatment for back and cervical pain from Dr. Michael P. Wittig ("Dr. Wittig"). R. at 413. She sought treatment from Dr. Wittig after she fell off of a rock wall on June 1, 2010, and claimed that she was in constant, extreme pain that severely interfered with her daily activities. See id. About a month and a half after this visit, on July 28, 2010, she told Dr. Wittig that the treatment made the pain "a little better," but that the pain still severely interfered with her usual daily activities. See R. at 414.

### 3. Shingles

Plaintiff was diagnosed with shingles on May 5, 2002, by Dr. Margaret Kozak ("Dr. Kozak"). R. at 266; see also R. at 231. Plaintiff had complained of burning and itching in her right eye. R. at 236. Dr. Kozak diagnosed Plaintiff and referred her to Dr. Jeffrey T. Liegner ("Dr. Liegner") for treatment. R. at 231, 266-67. On May 9, 2002, Dr. Liegner confirmed Dr. Kozak's shingles diagnosis and prescribed Plaintiff various medications. R. at 231. On May 20, 2002, Plaintiff was also prescribed pain medications by a different doctor for pain that she said had become worse from her shingles. R. at 267.

On August 16, 2002, Plaintiff complained of a blurry right eye. R. at 229. Dr. Liegner found progressive scarring and smoldering and once again prescribed her medications. Id. Plaintiff began having great difficulty with her right eye with smoldering and scarring caused by the shingles, which required treatment by Dr. Liegner beginning on June 5, 2006. R. at 228. Plaintiff complained to Dr. Liegner that the floaters had not gone away. Id. Dr. Liegner found scarring and

6

confirmed the shingles diagnosis. Id. He prescribed Plaintiff medication and told her to try to reduce her stress. Id. On April 7, 2009, Plaintiff again saw Dr. Liegner and complained of floaters and an inability to focus. R. at 227. Dr. Liegner found scarring and cataracts. Id. Plaintiff's diagnosis of shingles was confirmed on March 4, 2010, by Dr. Suma Ghanta, R. at 524, and her problems of blurry vision and floaters had continued until at least September 26, 2011, when she complained of these problems to Dr. Nathan Mitkoff ("Dr. Mitkoff"), R. at 526.

### B. ALJ Hearing

Plaintiff filed for Title II Social Security Disability benefits and Title XVI Supplemental Security Income benefits on December 28, 2010, and January 26, 2011, respectively. R. at 21. She is alleging a disability beginning October 1, 2004, which she claims resulted from back pain, neck pain, depression, PTSD, anxiety, and shingles. R. at 161. The SSA denied Plaintiff's application on April 1, 2011. R. at 21. Two months later, Plaintiff filed a written request for hearing on June 1, 2011. Id. ALJ Terence Farrell ("ALJ Farrell") conducted a hearing on April 11, 2012, in Albany, New York. R. at 21, 29.

During the hearing, an impartial medical expert, Louis A. Fuchs ("Dr. Fuchs"), testified about Plaintiff's medical records, and whether the alleged impairments met or equaled any of the listed impairments, which he opined that they did not. R. at 21, 24. Dr. Fuchs testified that aside from a mild tremor in the left upper extremity, he could not find any significant problem. R. at 41. He also stated that he did not believe that Plaintiff's impairment meets or equals any of the listed impairments in 20 C.F.R. § 404(P), Appendix 1. Id. The listed impairment that most closely relates to one of Plaintiff's impairments is "musculoskeletal," but Dr. Fuchs opined and the ALJ agreed that Plaintiff's impairment does not meet this impairment because the Record lacked objective

7

findings to show that the impairment meets all of the specified medical criteria. R. at 27, 41; 20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526.

Under questioning by Plaintiff's counsel, Dr. Fuchs agreed that Plaintiff had recurrent mid back, low back, and neck pain since a motor vehicle accident in 1976, but stated that Plaintiff's demonstrated clinical pain was based off of merely "subjective" findings. R. at 42. He also testified that the fact that a doctor performed a series of injections in Plaintiff's neck was at least somewhat indicative that the doctor thought there was a significant underlying problem that might be addressed by said injections. See R. at 42-43.

Dr. Fuchs further stated that when making his findings, he was unaware that Plaintiff had shingles in 2004, which she alleges caused pain in her neck and head. R. at 43. Dr. Fuchs explained, however, that these were subjective findings, and that as an orthopedist, he was only concerned with clinical examinations involving an objective exam. R. at 43-44. He also admitted, however, that shingles can sometimes cause chronic pain. R. at 44-45. In addition, Dr. Fuchs stated that degenerative joint disease can cause pain, but the mere presence of the disease does not mean that the patient will be symptomatic. R. at 45.

ALJ Farrell next presented Plaintiff with questions to determine her work capabilities, present medical state, and activities of daily life. R. at 46-68. Plaintiff stated that she currently has no income, and supports herself (including rent payments) with food stamps, social services, and Medicaid, and sometimes by performing chores for her landlady. R. at 49-50.

Plaintiff testified that she last worked and "g[o]t paid for it" in 2004 when she worked two jobs, but she later testified that since then, she worked two other jobs for a short period of time. R. at 50-51, 54-55. After her job as a bank teller, R. at 56, and up until 2004, Plaintiff worked two jobs

8

in the same building, R. at 51.  During the day she worked as a medical biller and at night she was a unit secretary.  R. at 52.  Plaintiff explained that as a medical biller, she billed insurance companies and Medicaid; as a unit secretary, she received information from all of the patients that came into the hospital, and also took doctor's notes regarding appointments with patients and entered them into a computer.  Id.  Plaintiff stated that she found it difficult to do these jobs because of the pain she was experiencing from her shingles, which eventually led to her being fired.  R. at 52-53.

After Plaintiff was fired from these jobs, she collected unemployment benefits.  R. at 53.  Plaintiff collected unemployment until she was no longer eligible and then she sold her house.  R. at 53.  Plaintiff was eventually able to find work as a full-time medical biller for a dentist.  R. at 54-55.  She worked there for just a few months before she left, and then worked for Home Depot.  R. at 55.  That job—where Plaintiff worked approximately 37.5 hours per week—lasted for less than a year.  Id.  Plaintiff has her GED and completed one year of college.  R. at 50.

Plaintiff also testified at the hearing about the pain that she has been experiencing.  R. at 57-62.  She stated that she has episodes of severe head pain that cause her eyes and nose to swell, and prohibit her from listening or talking to anybody due to inability to concentrate.  R. at 57-58.  Plaintiff further testified that the pain makes it hard for her to move.  R. at 58.  She said that this head pain started in 2003 or 2004, right after she contracted shingles, and has become progressively worse over time.  R. at 61-62.  According to Plaintiff, she has at least mild pain every day, but the episodes of "severe pain" are largely random, come on suddenly, and typically last six to seven hours.  R. at 58-59.

Plaintiff stated that she takes Naproxen two or three times a day, every day for the pain.  R. at 60.  She claimed that it does not help at all and only continues to take it because that is what the

9

doctor gives her. R. at 61. Plaintiff also listed all of the doctors who have treated her, and all of the medications that she takes. R. at 63-65.

Plaintiff further testified about her psychiatric issues. R. at 74-77. She stated that she has occasional episodes of depression, and has panic attacks a couple of times per month that last anywhere from one to two hours. R. at 75-77. Although she does not see a therapist for her anxiety and depression, she has in the past and currently takes medication for these illnesses. R. at 74-75.

Finally, Plaintiff testified that she spends her free time crocheting, taking care of the animals in the house, and cleaning the house. R. at 65-66. She testified that her pain prevents her from walking, which she used to enjoy, and that she now does not spend much time outside doing any other activities. R. at 67.

### C. The ALJ's Decision

ALJ Farrell issued a partially favorable decision on May 3, 2012, ruling that Plaintiff was "not disabled prior to January 26, 2011, but became disabled on that date and has continued to be disabled through the date of [his] decision." R. at 21; see also R. at 29. The ALJ found that Plaintiff has not engaged in any substantial gainful activity since October 1, 2004. See R. at 23. The ALJ then found that while prior to January 26, 2011, Plaintiff suffered from depressive disorder and cervical spine disorders, she "did not have an impairment or combination of impairments that significantly limited . . . [her] ability to perform basic work-related activities for [twelve] consecutive months; therefore, [Plaintiff] did not have a severe impairment or combination of impairments." Id.

ALJ Farrell further found that since "January 26, 2011, [Plaintiff] has had the following severe impairments: Cervical and lumbar spine disorders, history of respiratory disorders associated

with allergies and asthma, a depressive disorder, PTSD, panic disorder, and essential tremor." R. at 26.[1] He determined, however, that Plaintiff did not have "an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. at 26-27.

The ALJ went on to find that since January 26, 2011, Plaintiff "had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [Plaintiff] is limited to simple work with only occasional interaction with coworkers, supervisors, and the general public, and should avoid concentrated exposure to respiratory irritants." R. at 27. The ALJ ruled that because of Plaintiff's limitation to no more than simple tasks and only occasional contact with others, she is unable to perform her past relevant work and does not have work skills that are transferrable to other occupations within her residual functional capacity. R. at 28. In reaching this decision, the ALJ considered Plaintiff's age, education, work experience, and residual functional capacity, and found that "there are no jobs that exist in significant numbers in the national economy" that she can perform. Id.

Plaintiff subsequently filed a timely request for review of the unfavorable portion of the ALJ's decision on May 14, 2012. R. at 15-16. On October 15, 2013, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied the request for review. R. at 1. Plaintiff timely filed an appeal on November 8, 2013. Dkt. No. 1 ("Complaint").

---

[1] The respiratory disorders associated with allergies and asthma, and the essential tremor are not discussed in the Medical Records section of this Memorandum-Decision and Order, because they are documented after the date which the ALJ found Plaintiff to be disabled (January 26, 2011) and are thus not challenged in the present appeal.

11

**III. LEGAL STANDARD**

**A. Standard of Review**

When a court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "'even if it might justifiably have reached a different result upon a *de novo* review.'" Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when there is substantial evidence to support his decision, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

**B. Standard of Benefits**

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "'need not be completely helpless or unable to function.'" De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463

F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). "Substantial work activity" is work activity that involves "doing significant physical or mental activities." Id. § 404.1572(a). "Gainful work activity" is work that is "usually done for pay or profit, whether or not a profit is realized." Id. § 404.1572(b). If her current work activity amounts to "substantial gainful activity", the claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in § 404.1509. Id. § 404.1520(a)(4)(ii). If she does not have such impairment, the claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix 1. Id. § 404.1520(a)(4)(iii). If it does not, the SSA moves on to step four to review the claimant's RFC and past relevant work. Id. § 404.1520(a)(4)(iv). The claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work. Id. If the claimant cannot perform her past relevant work, the SSA decides at step five whether adjustments

can be made to allow the claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA considers the claimant to be disabled. Id.

## IV.    DISCUSSION

Plaintiff asserts that the Commissioner "did not properly consider the medical evidence in the record in light of the correct legal standards," and that Plaintiff should have been found to be disabled prior to January 26, 2011. Pl.'s Br. at 9. More specifically, Plaintiff argues that the Commissioner's finding that Plaintiff was not disabled prior to January 26, 2011, was "based upon the erroneous conclusion that [her] impairments . . . were not [severe] within the meaning of the law." Id. at 10. In other words, Plaintiff argues that her impairments should have been considered severe prior to that date. Id.

### A. Applicable Rules

At step two of the sequential analysis, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is: (1) "severe" within the meaning of the law; and that (2) meets the duration requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii); 404.1505(a). The burden is on the claimant to establish severe impairments and to submit medical and other evidence to support this. Id. § 404.1512(a).

An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. Id. § 404.1520(c). The phrase "basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." Id. § 404.1521(b). Examples of these that are listed in the C.F.R. are: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

14

(2) [c]apacities for seeing, hearing, and speaking; (3) [u]nderstanding, carrying out, and remembering simple instructions; (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers, and usual work situations; and (6) [d]ealing with changes in a routine work setting." Id.

An impairment or combination of impairments is "not severe" when medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 404.1521(a); Social Security Rulings ("SSRs") 85-28, 96-3p.

Any impairment must also meet the duration requirement stated in the regulations. 20 C.F.R. § 404.1505(a). The impairment or combination of impairments must last or be expected to last for a continuous period of at least twelve months in order for the impairment to be considered severe. Id.

When considering Plaintiff's symptoms at step two of the five-step sequential analysis, the ALJ must follow a two-step process. 20 C.F.R. § 404.1529. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could "reasonably be expected to produce the [claimant's] pain or other symptoms." Id. § 404.1529(a). The impairment must be shown by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 404.1529(c)(2). Statements about pain or other symptoms by the claimant will not alone establish disability. Id. Rather, there must be "medical signs and laboratory findings which show that [there is] a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion that [the claimant] is disabled." Id.

15

Second, once an underlying physical or mental impairment that can reasonably be expected to produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity and persistence of the claimant's symptoms and determine the extent to which they limit her capacity for work. 20 C.F.R. § 404.1529(c).

**B. Substantial Evidence in the Record Supports the ALJ's Decision**

In the instant case, the ALJ found that prior to January 26, 2011, Plaintiff had depressive disorder and cervical spine disorders, which are medically determinable impairments. R. at 23. The ALJ went on to find, however, that she did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for twelve consecutive months, and therefore she did not have a severe impairment or combination of impairments. Id. Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Act prior to January 26, 2011. R. at 29.

The standard of review affords great deference to the ALJ. Even if the district court might have justifiably reached a different result, the court will defer to the ALJ as long as his conclusion is supported by substantial evidence. Sixberry, 2013 WL 5310209, at *3.

Here, the ALJ's decision that Plaintiff's impairments were not severe prior to January 26, 2011, is supported by substantial evidence in the Record. The ALJ properly found that Plaintiff had cervical spine disorder and depressive disorder prior to this date. R. at 26. This finding was supported by magnetic resonance imaging (MRI) results, and statements in the record from many different doctors, which documented the pain Plaintiff had been experiencing and psychiatric problems she had been facing for decades. R. at 219, 222-24, 233-39, 316, 412, 440-45, 505. However, though Plaintiff did suffer medically determinable impairments, the medical records show

that her complaints were episodic and sporadic in nature. Id. Because of the nature of these complaints, the impairments never met the duration requirement of twelve consecutive months. Further, though the ALJ properly found that Plaintiff's cervical spine disorder was a medically determinable impairment, he was also correct in finding that there was no evidence establishing that this impairment caused more than minimal limitations on her ability to perform basic work activities—the Record only shows sporadic treatment for Plaintiff's neck and back pain. R. at 280-313.

Out of the eleven times that Plaintiff sought treatment for her neck and back within the five year relevant period—October 2004 through December 2009—three of them occurred within the same month, September 2005. R. at 289-91. After September 2005, Plaintiff did not seek treatment again until nearly two years later, in May 2007. R. at 297. At that point, Plaintiff sought treatment on five different occasions within a two-month period. R. at 297-301. In May 2007, Plaintiff sought treatment twice for her pain. R. at 297-98. She next sought medical treatment three times in June 2007. R. at 299-301. It was another year before Plaintiff returned to her doctor with complaints of back or neck pain, when she sought treatment on May 29 and June 2, 2008. R. at 307-08. Her next back treatment was more than ten months later in April 2009. R. at 311. Therefore, the Record shows that although Plaintiff sought treatment eleven times in five years, the visits were sporadic, and there is no evidence that the impairment lasted for a consecutive twelve-month period.

Next, while there is evidence in the Record that Plaintiff suffered from depression and anxiety, her complaints regarding these issues were also sporadic and episodic in nature, and appear to have been responsive to treatment. R. at 233-313. Plaintiff first sought treatment for depression

17

in December 1998.  R. at 233.  She subsequently sought treatment twice in 1999, and once in 2000 and 2001.  R. at 234-35, 244, 258.  Plaintiff returned to Sparta in November 2001 and was diagnosed with anxiety.  R. at 233.  This diagnosis was confirmed in August 2002, November 2007, and April 2010.  R. at 269, 304, 516-19.  Her depression diagnosis was also confirmed in 2010, but there is no evidence in the Record of Plaintiff seeking treatment for depression between 2001 and 2010.  See R. at 233-313, 504-05.

Based on the medical records submitted, although Plaintiff's depression and anxiety might have been an impairment, there is substantial evidence in the Record to support the ALJ's finding that this impairment was not severe because there is no evidence showing that Plaintiff's depression and anxiety lasted for the requisite twelve-month period.  In addition, all of the medical records of Plaintiff seeking treatment for depression occurred outside the five-year relevant period between October 2004 and December 2009, R. at 233-35, 244, 258, 504-05, and only one record documents Plaintiff seeking treatment for anxiety within that period, R. at 304.  Furthermore, Plaintiff did not receive any formal psychiatric care within the five-year relevant period, R. at 281-313, and although she testified that she had sought care, R. at 74, there is no evidence in the Record to support that contention, R. at 281-313.  Plaintiff did see psychologist Dr. Brand, but that was in March 2011, after the relevant period.  R. at 440

Plaintiff also has a documented history of shingles, but the medical records related to it are from 2002, which is prior to Plaintiff's alleged date of disability.  R. at 229-31, 266-67.  In addition, Plaintiff's ophthalmologist, Dr. Leigner, opined that she did have some scarring on her right eye, but the most recent record, from April 2007, showed that Plaintiff was doing needlepoint and that she only wore over-the-counter reading glasses.  R. at 227-29.  Wearing only over-the-counter reading

glasses can be indicative that vision problems are not severe. See Kaminski v. Astrue, No. 09-CV-655, 2012 WL 887468, at *5 (N.D.N.Y. Feb. 21, 2012). Furthermore, Plaintiff testified that she spends much of her free time crocheting, R. at 66, needing only over-the-counter reading glasses, R. at 227-29. Therefore, it was reasonable for the ALJ to question Plaintiff's claims regarding her vision problems due to shingles.

Moreover, Dr. Fuchs—a medical expert who testified at the hearing—opined that from an orthopedic standpoint, Plaintiff did not have any significant impairments prior to July 2011. R. at 40-42. Dr. Fuchs admitted that there was some circumstantial evidence in the Record to make an inference that she might have been experiencing pain—such as injections for pain relief, degenerative disease findings, and muscle spasms—but he found the Record lacking objective, clinical support for any orthopedic limitations. R. at 42-47.

Based on the foregoing, the ALJ properly found that the impairments that Plaintiff had been facing prior to January 26, 2011—namely, depressive disorder and cervical spine disorder—were not severe under the law, as they did not limit her ability to perform basic work activities for the requisite twelve consecutive months.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: August 04, 2015
Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge